UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARREN CLEVELAND,<br><br>  Petitioner,<br><br>  v.<br><br>JEFF MACOMBER,<br><br>  Respondent. | Case No. 19-cv-01948-WHO (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Dkt. No. 19 |

## INTRODUCTION

Petitioner Darren Cleveland seeks federal habeas relief from his state convictions for attempted premeditated murder and assault and other crimes on grounds that the identification procedure was unduly suggestive in violation of due process, he received ineffective assistance of counsel, and the prosecutor committed misconduct. None of these claims has merit. The identification procedure was not tainted by law enforcement, and therefore Cleveland's counsel had no legitimate basis on which to offer an objection. There is no evidence that the prosecutor committed misconduct. The petition is DENIED.

## BACKGROUND

On May 28, 2014 Cleveland attempted to kill his son Dorian's high school classmate, sixteen-year-old Marlon M., in revenge for Marlon having punched Dorian earlier that month:

> Cleveland's son D. attended high school with M., the victim in this case. In May 2014, they got into an argument while playing basketball at school, and M. attacked D., sucker punching him and causing him to fall to the ground. D. suffered bruises underneath both eyes and redness and swelling on his cheek and eyebrow, and he was taken to the hospital. As a result of the assault, M. was suspended from school and then expelled. [At trial, Parks, the high school security officer, testified that when he told Cleveland Marlon had been expelled, Cleveland said, "he wished he hadn't been expelled so he would be able to be easily touched." (Ans., Reporter's Transcript, Dkt. No. 13-7 at 20.]

United States District Court
Northern District of California

Jordan Peterson, a school resource officer, called Cleveland to notify him of the assault and told him that his son was going to the hospital. Cleveland remarked 'if he was there, he would [have gone] to prison.'

L. went to high school with D. and M. He learned about their altercation when he saw video of the incident on Instagram. Soon after he learned about the fight, L. met a man at a donut shop across the street from school. The man introduced himself as 'Coach Dre' and said he was concerned about his son, D., who had just gotten in a fight. [FN1: Cleveland coached basketball, and his friends and family called him 'Dre.'] L. and the man exchanged phone numbers. The man told L. that he and his son wanted to talk to M. and his parents, and he was trying to locate M. The man did not know what M. looked like, and L. sent him two photos of M. L. later told law enforcement that he communicated with the man for 'like a week or two.' An examination of L.'s cell phone showed Cleveland's cell phone number was saved in L.'s contacts under the name 'Coach Dre.' Forensic examination of Cleveland's cell phone confirmed that, starting the day after M. attacked D., Cleveland exchanged text messages with L. in which they discussed M. and his whereabouts.

Three weeks after M. assaulted Cleveland's son at school, M. was himself assaulted. Around 2:00 p.m., M.'s parents dropped him off at a youth center at 163rd Avenue in San Leandro. M. walked from the center to his friend's house a few blocks away. M. testified that his friend was not home, and he walked back toward the youth center.

As M. walked on 163rd Avenue toward East 14th Street, a man holding a wooden baseball bat approached him. He asked M. his name, and M. said his name was James.[1] The man responded, 'No, your name is [M.],' and swung his bat at M., who started to run away. The bat hit M. on his left thigh. M. turned down Blanco Street and ran toward 164th Avenue. A car pulled up next to M., and he heard someone say, 'Hey.' He saw the driver of the car point a gun out the window at him. [FN2: M. testified that he knew '[a] little bit' about guns, and the gun pointed at him was black and 'just looked like a regular Glock.'] M. changed directions and started running toward 163rd Avenue. He heard six shots. M. was hit once in the shoulder. He was bleeding and couldn't feel his arm. M. ran to the youth center and started to pass out. [A sheriff's officer went to the youth center and taped Marlon describing his attacker as a "thirtysomething" black man. (Ans., Reporter's

---

[1] The police asked Marlon, "Okay, why do you think this guy's coming to ask you what your name is?" Marlon responded, "I don't know." He was then asked, "What's your suspicion?" Marlon responded, "It has to do with a fight that happened a while ago." (Ans., Transcript of Marlon's Police Interview, Dkt. No. 13-13 at 365.) Marlon admitted he was referring to the fight with Dorian. (*Id.* at 366.)

Transcript, Dkt. No. 13-13 at 392.)]

A witness who was working on 164th Avenue at Blanco Street heard five or six gunshots coming from Blanco Street. He looked out on the street and saw a gray or silver Acura or Honda driving 'pretty fast' on Blanco Street. The car turned left eastbound onto 164th Avenue. This witness heard the screech of tires and saw the car run through a stop sign. The driver was a Black male.

A deputy responded to the youth center around 3:15 p.m. The deputy asked M. who did this, and M. said he had never seen the person before. M. said the man was 'like thirty something' and Black. Peterson, the school resource officer, heard about the shooting and went to the youth center. When he realized the shooting victim was M., he told the deputy about the fight between M. and Cleveland's son. M. was taken to the hospital, where he stayed for about a week. He had surgery and had 20 stitches.

Two days after the shooting, Detective Patrick Smyth and Sergeant Ken Gemmell met with M. at the hospital. M. was in the intensive care unit and his parents were present. M. was in some pain, but 'he seemed to have his wits about him' based on his appropriate responses to simple questions about his personal history. Gemmell gave M. a photographic lineup, and M. identified Cleveland. M. wrote under Cleveland's photo, 'I think this person hit me with a bat and shot me.'

Detective Smyth obtained surveillance video taken the afternoon of the shooting at a store on East 14th Street and 163rd Avenue. The video showed a silver car travel westbound on 163rd Avenue, pull over, and park next to the store. The car remained for approximately 18 minutes, and then at 3:10 p.m., a man apparently got out of the car, walked away, returned about a minute later, and drove away. At trial, Smyth explained, 'From what we saw there, we had a vehicle that was related to our suspect.' He then learned that Cleveland was the registered owner of a 2000 four-door silver Acura TL and obtained a photograph of Cleveland's actual car. Cleveland's car appeared 'to be the same type of vehicle that we saw on the [surveillance] video,' sharing characteristics such as a rear spoiler.

Two days after the shooting, law enforcement located Cleveland's Acura near his residence in West Oakland and had the car impounded. Gunshot residue was detected on samples collected from the driver's side window trim, interior handle and controls, and exterior and interior window ledge and from the steering wheel and gear shift of Cleveland's car.

An expert in cell phone sector analysis reviewed Cleveland's cell phone call detail records for the day of the shooting. Based on his analysis, the expert

testified it was reasonable to conclude Cleveland's cell phone was in Oakland around 10:00 a.m., it made its way down to San Leandro by around 2:50, and it was back in Oakland at 3:45 p.m.  At 2:56 p.m., Cleveland's phone used a cell tower that covered an area (sector) including the location of the shooting.  [Cleveland's cell phone history shows he searched for 'Marlon M.' on Facebook, Intelius, and Peoplefinder.  (Ans., Reporter's Transcript, Dkt. No. 13-9 at 458.]  In a search of Cleveland's house, a gun case or box for a Glock 9 mm and an ammunition magazine were found in a kitchen cabinet.  [FN3:  Seven 9 mm shell casings were recovered from Blanco Street between 163rd and 164th Avenues. An expert in firearms identification determined that the seven casings were fired from the same Glock pistol.]  A gun cleaning kit for 9mm, .357, .38 caliber firearms was located in the garage; it had not been used.  No firearm or baseball bat was found.  [In a taped jailhouse conversation, Cleveland asked, 'Did you see the video [of Marlon's fight with Dorian]?  You seen what this little piece of shit ass motherfucker did?  What did you think was supposed to happen?'  (Ans., Dkt. No. 13-13 at 482.)  Later in that same conversation, Cleveland said, ' . . . you know when you do some stupid ass shit like that to the wrong people . . . [a]nd you expect nothing to happen.'  Cleveland then laughed.  (*Id.* at 483.)]

As we have mentioned, M. identified Cleveland from a photographic lineup two days after the shooting.  A recording of M.'s hospital interview with law enforcement was played for the jury.  At trial, however, M. testified he was sure that Cleveland was not the person who hit him with a bat and shot him from a car.  [FN4:  At trial, M. testified the assailant was Black, appeared to be about 30 years old and about six feet tall, and he had stubble on his chin.  He also said the shooter's car was 'bluish.']  In his hospital interview with Smyth and Gemmell, M. said the car was silver.  M. further testified he did not remember talking to detectives about the case.  He denied recollection of being shown a photographic lineup although he recognized his signature and handwriting on the photographic lineup presented to him at trial.  M. denied that he was scared to testify, but agreed he did not want to be in court.  He said testifying at trial was '[j]ust too much stress.'  His parents did not want him to testify because it was 'too much stress' for a 'kid.'  M. testified there were 'a lot' of consequences to being labeled a 'snitch.'

L. did not identify Cleveland as the man he knew as Coach Dre.  At trial, L. testified he did not remember much of his interactions with this man.  He described the man as having a big beard.  L. could not describe the man in much detail, saying only 'he wasn't white,' and '[h]e wasn't young.'  L. did not want to testify and said he was not feeling good, but he denied he was scared to testify.  L. testified under a grant of use immunity.  He had been arrested and questioned about two months after the shooting, and his recorded interview was played for the jury.

(Ans., State Appellate Opinion, Dkt. No. 13-13 at 239-243.)[2]

In 2015, an Alameda County Superior Court jury convicted Cleveland of attempted premeditated murder; discharge of a firearm from a motor vehicle; assault with a deadly weapon; and possession of a firearm by a felon with three prior convictions. (*Id.* at 247.) A sentence of 30 years to life was imposed. (*Id.* at 247-248.) Cleveland's attempts to overturn his convictions in state court were unsuccessful.[3] After remand, it appears the sentence was altered to 25 years to life. (Pet., Dkt. No. 1 at 1.) This federal habeas petition followed.

As grounds for federal habeas relief, Cleveland alleges that (i) the identification procedure was unduly suggestive, in violation of due process, and its admission at trial was prejudicial; (ii) defense counsel rendered ineffective assistance; and (iii) the prosecutor committed misconduct when he provided an allegedly altered transcript to the jury.

Claim (i) is unexhausted. In response to an order regarding exhaustion, Cleveland filed a motion to stay proceedings so that he can exhaust a claim in state court. (Dkt. No. 19.) The motion will be denied because Cleveland is not entitled to relief on his claim, rendering his motion moot.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

---

[2] *People v. Cleveland*, No. A146434, 2018 WL 1516869 (Cal. Ct. App. Mar. 28, 2018).

[3] The appellate court did remand for resentencing and other matters. The case was "remanded to the trial court to consider whether it should in the interests of justice under section 1385 strike the firearm enhancement under section 12022.53, subdivision (d). The trial court is ordered to correct the abstract of judgment to reflect (1) Cleveland was awarded 67 days of local conduct credit, and (2) for count 2, the enhancement under section 12022.53, subdivision (d), is stayed. The clerk's minutes are corrected to reflect (1) Cleveland was awarded 67 days of local conduct credit, and (2) the entire sentence imposed for count 2 was stayed under section 654. In all other respects, the judgment is affirmed." (Ans., State Appellate Opinion, Dkt. No. 13-13 at 287.)

The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### i.    Identification Procedure

Cleveland contends on federal habeas review that "the photo line up was unnecessarily suggestive and conducive to a mistaken identification." (Pet., Dkt. No. 1 at 5.) He claims that the photo identification procedure violated his due process rights because the police used a tainted procedure to make it look like Marlon had identified him as the perpetrator when in fact, according to the transcript of the photo identification interview, Marlon did not identify him. (*Id.* at 5, 9-13.) This claim is unexhausted

because Cleveland never presented it to the state courts.  Rather, in state court, Cleveland contended that the photo line-up was unduly suggestive "because his ears stuck out furthest of the six men shown, "he had a full stubbly beard," and Marlon "expected to see the suspect in the line-up."  (Ans., State Appellate Opinion, Dkt. No. 13-13 at 246.)  In an abundance of caution, I will review the claim he exhausted (but did not raise here) and the claim he presented here (but did not exhaust).

### a.    Facts

The state appellate court summarized the facts as follows:

> In this case, Detective Smyth explained that the sequential photographic lineup shown to M. was created by taking Cleveland's photograph from the DMV, searching for photos of other men based on height, weight, approximate age, and other shared characteristics, and then selecting five 'filler photographs' that were similar to Cleveland's photo.  The six photographs are head shots of the same size with the same blue backgrounds, and the men depicted appear to be similar in race, complexion, age, and build.  Four of the men appear to be bald or have shaved heads (photos 1, 2, 3, and 5), while the other two appear to have short hair, and the men have varying facial hair—one has a mustache (photo 2), at least two others appear to have goatees (photos 1 and 4)—but these variances do not cause any particular photo to stand out.  (*See People v. Johnson* (1992) 3 Cal. 4th 1183, 1217 ['Minor differences in facial hair among the participants did not make the lineup suggestive.'].)

> When M. was interviewed in the hospital two days after the shooting, he described his assailant as Black, '[k]inda light skinned,' 35 or 36 years old, a little shorter than himself, 'regular size,' and he was wearing a black and red hat, and long black shirt. M. thought he could recognize the shooter.  Sergeant Gemmell asked whether anything about the shooter stood out.  M. responded, 'His ears, and I think he had a little beard.'  Gemmell asked, 'maybe a little stubbl[ ]y down by the chin or all the way through?'  M. said, 'Like, all the way through kind of,' and agreed with Gemmell's suggestion that the shooter's facial hair was like 'a couple days without shaving.'  M. said the shooter's 'ears was kind of wide out,' meaning they stuck out a little, and then commented, 'I think it's because of the hat.'  Gemmell and Smyth asked what the shooter was wearing and whether he had jewelry or tattoos.  Then they returned to questions about the shooting—how the car approached M., how the shooter pointed the gun, what M. did, and whether anyone may have seen the crime.

Next, Gemmell presented M. the sequential photographic lineup. Smyth pointed out that a beard could be shaved, so that could easily change. He told M. he wanted him to focus on 'stuff like your nose, your ears, your eyes, your . . . lips,' things that would not change 'unless you have plastic surgery.' Gemmell explained how the photo lineup would proceed, and told M. the shooter may or may not be included among the photos and M. should not feel that he had to make an identification.[4]

M. wrote his name on each photograph as he looked at it. After he viewed all six photos, he went over them again. M. picked Cleveland's photo. Gemmell asked what about the photo made him choose it, and M. responded, 'Looks like the dude.' Asked to explain, he said, 'He—he just looks like him.' Smyth asked, 'What, his eyes, nose, . . . mouth, anything? His head? Ears?' M. responded, 'His ears,' and then, 'And his—the beard.' Smyth said, 'The beard. And . . . you were indicating with your hand along the whole face. The—anything else about it? Okay.' Gemmell asked about M.'s level of certainty. M. said, 'He just looks like the person that hit me with the bat.'

Cleveland now argues the photo lineup procedure in this case was unnecessarily suggestive because his ears stuck out furthest of the six men shown, 'he had a full stubbly beard,' and M. expected to see the suspect in the lineup.

(Ans., State Appellate Opinion, Dkt. No. 13-13 at 244-246.)

### b.    Analysis

Cleveland challenged the constitutionality of the line-up procedure in his state court

---

[4] "Gemmell gave M. the following admonition: '[W]e're going to show you a series of individual photos, and the person who committed the crime may or may not be included in these pictures. Even if you do identify someone during this procedure, we're going to continue to show you all the photos in the series, and the investigation will continue whether or not you do make an identification, so what that means is we've got six photos. He's making them in a random order. If we show you . . . number two and that happens to be the third photo that we show you, and you say, 'Well, I [want to] go back and see the last one,' we're [going to] go through the whole thing. We're going to show you one through six, and then we'll go back over and we'll do it again. So we [want to] remind you that things like hairstyles, beards, moustaches can easily be changed, and that complexion colors may look slightly different in photographs. You should not feel that you have to make an identification, because it's just as important to exclude innocent persons as it is to identify the perpetrator. We're going to show you the photos one at a time, and we want you to take as much time as you need to look at each one, and if you wish to see a photo again, then we're going to show you all of the photos in the same sequence once more time. Do you understand?' M. indicated he understood the admonition."

8

proceedings.  I will first review the exhausted claim and then the one presented here.

### (i)    Exhausted Claim

On state review, Cleveland claimed that the photo line-up was unduly suggestive because his ears stuck out furthest of the six men shown, "he had a full stubbly beard," and Marlon "expected to see the suspect in the line up."[5]  (Ans., State Appellate Opinion, Dkt. No. 13-13 at 246; Pet., Petition for Direct Review, Dkt. No. 1 at 28.)  The state appellate court rejected those claims.  It concluded that Cleveland's photo "does not stand out." (Ans., State Appellate Opinion, Dkt. No. 13-13 at 246.)  His ears "do not stick out in a particularly pronounced way in his photograph." (*Id.*)  "[A]t least two of the other men (photos 2 and 6) appear to have ears that are about as prominent as Cleveland's ears." (*Id.*) Also, the state court disagreed with "Cleveland's suggestion that his photo is the only one that shows a fully stubbly beard or facial hair from a couple days without shaving." (*Id.*) "Instead, the man in photo 5 appears to have stubble, and Cleveland appears to have a goatee." (*Id.*)

In addition, the state court noted that Marlon "was expressly told the shooter might not be included among the photos and he should not feel that he had to make an identification." (*Id.*)  It rejected the notion the line-up was unconstitutional simply because, in the words of defense counsel, "it stood to reason that the suspect would be one of these six photos that you were shown." (*Id.*)  After reviewing the transcript of Marlon's hospital interview, the court found "nothing unnecessarily suggestive about the photo lineup procedure employed in this case." (*Id.* at 247.)

An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, increasing the likelihood of misidentification.  *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985); *see, e.g., United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial

---

[5] Cleveland also contended the victim lacked certainty in his identification, did not have much of an opportunity to observe the perpetrator, and gave only a limited description of the perpetrator to law enforcement.  The Court need not review these claims as they relate to the weight of the evidence, not its admissibility.

expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender); *Bagley*, 772 F.2d at 493 (repeated showing of picture of individual impermissibly reinforces image of picture in mind of viewer). Due process may require suppression of eyewitness identification evidence if law enforcement procured the identification using unnecessarily suggestive procedures. *Perry v. New Hampshire*, 565 U.S. 228, 238-239 (2012).

However, even if the identification was so procured, "suppression of the resulting identification is not the inevitable consequence." *Id.* at 239, citing *Manson v. Brathwaite*, 432 U.S. 98, 112-113 (1977); *Neil v. Biggers*, 409 U.S. 188, 198-199 (1972). "Instead of mandating a per se exclusionary rule," the U.S. Supreme Court has held that the Due Process Clause "requires courts to assess, on a case-by-case basis whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Biggers*, 409 U.S. at 201). Reliability is the "linchpin" of that evaluation. *Id.* (quoting *Brathwaite*, 432 U.S. at 116). "Where the 'indicators of [a witness's] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id.* (quoting *Brathwaite*, 432 U.S. at 114). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.*

Habeas relief is not warranted on this claim. The state court's rejection of it was reasonable because there is nothing indicating that law enforcement used "unnecessarily suggestive procedures." *Perry*, 565 U.S. at 238-239. Marlon was shown six numbered photos, one at a time, depicting African-American males of the same age, weight, and build. He was shown the photos in a random order (5, 2, 3, 4, 1, 6) and selected No. 3, Cleveland's photo, on which he wrote "I think this person hit me with a bat and shot me." Neither Cleveland's ears nor his facial hair rendered the line-up unconstitutional. Other persons in the line-up had similar ears and facial hair.

Marlon's possible belief that the suspect was in one of the displayed photographs

does not mean that the line-up was unduly suggestive.  Any person asked to review a photo line-up may well believe that the suspect appears in the line-up.  If that belief could render a line-up unconstitutional, then all line-ups would be unconstitutional.  There is nothing in this record to suggest that any improper police conduct created a "'substantial likelihood of misidentification.'"  *Perry*, 565 U.S. at 239 (quoting *Biggers*, 409 U.S. at 201).

Furthermore, the other evidence of Cleveland's guilt forecloses any showing of prejudice.  Cell phone records placed Cleveland close to the scene on the day of the attack; the assailant knew Marlon's name; Cleveland matched the description Marlon provided while he was waiting for medical help; Cleveland's car matched the assailant's car, and gun residue was found on the driver's side of Cleveland's vehicle; Cleveland had a motive (based on Marlon's punching Dorian) and said when informed of the fight that "he [Cleveland] would have gone to prison" had he been there during the attack; Cleveland had Lonnie, his son's high school classmate, keep track of Marlon and obtain his photograph; he used his phone to search for Marlon's name on Facebook, Intelius, and People Finder; Marlon testified that his assailant fired a Glock pistol, which uses nine-millimeter ammunition, and nine-millimeter shell casings were found at the scene; and a gun case for a nine-millimeter Glock, an ammunition magazine, and a cleaning kit for a nine-millimeter pistol were found at Cleveland's house.  After his arrest, Cleveland told friends and family Marlon was a "little piece of shit ass motherfucker" who should be taught not to do "stupid ass shit . . . to the wrong people."  Even if the line-up procedures were impermissibly suggestive (they were not), there can be no finding of prejudice in light of the strong record of inculpatory evidence.  Had this claim been presented on federal habeas review, I would have denied it.

### (ii)   Unexhausted Claim

#### (a)   Exhaustion

In the claim Cleveland presents for federal review, Cleveland contends that the photo identification procedure violated his due process rights because the police used a tainted procedure to make it look like Marlon had identified him as the perpetrator, when

United States District Court
Northern District of California

in fact, according to the transcript of the photo identification interview, Marlon did not identify him.  (Pet., Dkt. No. 1 at 5, 9-13.)  Cleveland did not exhaust this claim.

Cleveland alleges that the police showed Marlon a series of six photos.  Each photo was assigned a number, and the photos were shown in the following order:  5, 2, 3, 4, 1, 6.  (*Id.* at 121.)  The transcript of the interview indicates that Marlon identified No. 3 as looking like the person who hit him with a bat and shot at him.  (*Id.* at 110.)  Cleveland contends that, per the accompanying line-up chart, his photo was photo number 1, not photo number 3.  (*Id.* at 5, 9.)  He claims that the police then manipulated the evidence by placing his photo as the third photo and relabeling the photos to A, B, C, D, E, and F, so that his photo became photo C.  (*Id.*)  As evidence of his theory, Cleveland points to trial exhibit 7, which contains copies of the photos shown to Marlon (and which appears in this habeas action as Exhibit J attached to respondent's answer).  (Ans., Trial Exhibit 7, Dkt. No. 13-13 at 342.)

This claim was not presented to the state courts.  Instead, as just discussed, Cleveland contended that the identification procedure was unduly suggestive because his photo was the only one in the line-up with certain distinct features (full beard and ears that stick out).  In his traverse, Cleveland asserted that he did exhaust the claim because he presented a claim about the constitutionality of the line-up to the state court, and his new argument in the federal petition is simply based on evidence that was in the record when the state court reviewed his original challenge to the line-up.  (Trav., Dkt. No. 17 at 9.)  However, to exhaust a claim for purposes of federal habeas review, a petitioner must provide to the state's highest court "the operative facts, that is 'all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies.'"  *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008) (citations omitted).  A general allegation of a right is not sufficient to alert a court to separate specific factual instances related to that right, *see Wood v. Ryan*, 693 F.3d 1104, 1120 (9th Cir. 2012) (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)), and a petitioner does not exhaust all possible claims stemming from a common set of facts merely by raising one specific claim, *see*

12

1    *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013).

2         The state supreme court was not presented with the operative facts of the claim that

3    Cleveland now makes.  In presenting the original claim challenging the photo line-up as

4    unconstitutionally suggestive, he submitted the line-up chart, line-up photos, police

5    affidavit, and transcript of the line-up interview as evidence, but he made no mention of

6    any issues concerning the numbering of the photos or the order in which the photos were

7    presented, nor any allegations that the police tainted the procedure to make it look like the

8    victim identified Cleveland's photo when the victim actually did not.  (Ans., Petition for

9    Direct Review, Dkt. No. 13-13 at 261-266.)   This claim is unexhausted.

10        Prisoners in state custody who wish to challenge collaterally in federal habeas

11   proceedings either the fact or length of their confinement are first required to exhaust state

12   judicial remedies, either on direct appeal or through collateral proceedings, by presenting

13   the highest state court available with a fair opportunity to rule on the merits of each and

14   every claim they seek to raise in federal court.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*,

15   455 U.S. 509, 515-16 (1982).  The state's highest court must be given an opportunity to

16   rule on the claims even if review is discretionary.  *See O'Sullivan v. Boerckel*, 526 U.S.

17   838, 845 (1999).  Even though non-exhaustion is an affirmative defense, the petitioner

18   bears the burden of proof that state judicial remedies were properly exhausted.  *Parker v.*

19   *Kelchner*, 429 F.3d 58, 62 (3d Cir. 2005).  If available state remedies have not been

20   exhausted as to all claims, the district court must dismiss the petition.  *See Rose*, 455 U.S.

21   at 510.

22        That said, I may also deny a habeas claim on the merits even if it is unexhausted.

23   *See* 28 U.S.C. § 2254(b)(2); *Runningeagle v. Ryan*, 686 F.3d 758, 777 n.10 (9th Cir. 2012);

24   *see also Jones v. Davis*, 806 F.3d 538, 544-45 (9th Cir. 2015) (concluding that just as

25   courts have discretion to deny a claim on its underlying substantive validity under §

26   2254(b)(2) without reaching the exhaustion issue, they also have discretion to deny a claim

27   as *Teague*-barred under § 2254(b)(2) without reaching the exhaustion issue).  Although I

28   am not required to do so, *see Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999), in the

United States District Court
Northern District of California

1    interests of efficiency I will do so here.

2                    **(b)   Merits**

3            I deny this claim because Cleveland offers no factual support that law enforcement

4    manipulated the photographs or in any way created a substantial likelihood of

5    misidentification.  His contention regarding the capital letters cannot succeed.  It is true

6    that each page of the trial exhibit shows a photograph and at each bottom right-hand

7    corner, a capital letter is handwritten on the page.  (Ans., Trial Exhibit 7, Dkt. No. 13-13 at

8    343-348.)  But these letters are trial exhibit identifiers and are not indicative of the order in

9    which police showed the photos to Marlon.  (*Id.*, Reporter's Transcript, Dkt. No. 13-9 at

10   25-27.)

11           Cleveland's contention regarding the line-up chart (or composite sheet) lacks merit

12   because the numbers on the sheet do not correspond to the letters assigned to the photos

13   shown to plaintiff.  (*Id.*, Dkt. No. 13-13 at 351.)  Cleveland is designated as "1" on the

14   composite sheet, but that is because as the suspect, his photograph was drawn first.

15   Photographs of five other men were then drawn to complete the line-up.  (*Id.*, Reporter's

16   Transcript, Dkt. No. 13-9 at 18.)  The last page of the exhibit (which is entitled "Alameda

17   County Sequential Identification Form") confirms that the identification procedure

18   occurred just as the state appellate court said it happened; the photos were shown in the

19   order described (5, 2, 3, 4, 1, 6, with No. 3 being assigned to Cleveland).  (*Id.* at 349.)  It

20   also shows Marlon's handwriting on Cleveland's photograph (No. 3), identifying him as

21   the attacker:  "I think this person hit me with a bat and shot me."  (*Id.* at 345.)  Cleveland's

22   allegation that law enforcement manipulated the photographs lacks proof.  Without any

23   factual support, this claim necessarily fails and is DENIED.

24           As a result, Cleveland's motion for a stay so that he can exhaust his claim is

25   DENIED.  (Dkt. No. 19.)  Because he has not shown a factual basis that police procedures

26   were unconstitutional, he has not shown that he is entitled to relief on such a claim.  A stay

27   to exhaust is therefore unnecessary.

28

United States District Court
Northern District of California

ii.     **Assistance of Counsel**

Cleveland contends that trial counsel rendered ineffective assistance by failing to object to the line-up.  (Pet., Dkt. No. 1 at 5, 11-12.)  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish that (1) counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984), and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (citing Strickland, 466 U.S. at 693).

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks and citations omitted).  "The question [under § 2254(d)] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The state appellate court rejected this claim.  "Given our conclusion that the photographic lineup procedure was not impermissibly suggestive, trial counsel was not ineffective in not moving to suppress." (Ans., State Appellate Opinion, Dkt. No. 13-13 at 247.)  The cases cited by the state court stand for the proposition that counsel had no duty to object because there was no basis to challenge the line-up, and because any suppression motion would have been denied.  (*Id.*)

Habeas relief is not warranted.  The state court analyzed the line-up procedure and denied Cleveland's claims as meritless.  Because the line-up procedure was not unconstitutional, there was no legitimate basis on which Cleveland's counsel could object to it.  It is both reasonable and not prejudicial for defense counsel to forgo a meritless

1    objection.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).  Furthermore, the

2    evidence of guilt was strong, as detailed above.  The state court's rejection of his claims

3    was reasonable and is entitled to AEDPA deference.  This claim is DENIED.

4    **iii.      Prosecutorial Misconduct Claim**

5              Cleveland contends that the prosecutor committed misconduct by submitting to the

6    jury an altered transcript of Marlon's police interview, and that trial counsel rendered

7    ineffective assistance by failing to object.  (Pet., Dkt. No. 1 at 14-16.)  According to

8    Cleveland, the prosecutor altered the transcript by writing on it with a highlighter.  He then

9    copied this altered version and submitted it as People's Exhibit 8A.  (Pet., Dkt. No. 1 at 14-

10   16.)

11             This claim was raised only on collateral review, and it was summarily denied by the

12   state courts.  Therefore, there is no reasoned opinion.  When presented with a state court

13   decision that is unaccompanied by a rationale for its conclusions, a federal court must

14   conduct an independent review of the record to determine whether the state-court decision

15   is objectively unreasonable.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

16   This review is not de novo.  "[W]here a state court's decision is unaccompanied by an

17   explanation, the habeas petitioner's burden still must be met by showing there was no

18   reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98

19   (2011).

20             A defendant's due process rights are violated when a prosecutor's conduct "so

21   infected the trial with unfairness as to make the resulting conviction a denial of due

22   process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation

23   marks omitted).  Under *Darden*, the first issue is whether the prosecutor's conduct was

24   improper; if so, the next question is whether such conduct infected the trial with

25   unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  It is "the fairness of the

26   trial, not the culpability of the prosecutor" that is the touchstone of the due process

27   analysis.  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

28             When this claim was presented on collateral state review, Cleveland's appellate

United States District Court
Northern District of California

16

counsel (Jeffrey Glick) submitted a declaration in which he averred People's Exhibit 8A had "unusual markings":

> I compared my copy of Exhibit 8A to the exhibit in the court's file, and determined that the markings on my copy of the exhibit corresponded to markings on the court's copy. All but two of the markings, most of which appear as outlines on the copied version, corresponded to marks made by a green highlighter on the copy in the court's file. These markings appear on pages 1, 2, 7, 9, 10, 12, 14, 21, 30, 31, and 33. One of the other markings was the word, 'Important,' written in pen next to a green highlighter asterisk or star on page 7. The final marking appears to be a handwritten correction of the typed transcript by insertion of the word 'on,' written in a different pen, on page 8.

(Ans., Glick Decl., Dkt. No. 13-13 at 216-217.) Glick "confirmed" with the court clerk that "the court's copy of Exhibit 8A was exactly as the records clerk received it from the courtroom." (*Id.* at 217.) He stated that trial counsel (Bequette) had said he had a copy of what became Exhibit 8A, but Bequette didn't review the copy that was given to the jurors. (*Id.* at 216.)

In response to this state habeas claim, the trial prosecutor, Deputy District Attorney Chris Cavagnaro, submitted a declaration, in which he averred he reviewed Exhibit 8A, and determined that the writing on the exhibit "is not my handwriting." (Ans., Cavagnaro Decl., Dkt. No. 13-13 at 107.) He also provided a detailed explanation about how he prepares transcripts:

> I do not have [an] independent recollection of creating People's 8A. However, I can speak to my common practice in creating, marking, and introducing transcripts at evidentiary hearings. When a recorded statement needs to be transcribed, our office sends a copy of the recorded statement to a transcription service. The transcription service then sends me an electronic copy of the transcript of the recorded statement. After reviewing the transcript for accuracy, I save a copy of the electronic transcript on my computer for future use. If I intend to play the recorded statement at trial, I have a copy of the recorded statement and the related transcript premarked and lodged as exhibits with the trial court. If I play the recorded statement during trial, I print a new copy of the stored electronic transcript, make a photocopy of the transcript for each member of the jury, and provide those photocopies to the jury.

United States District Court
Northern District of California

> I followed my common practice in this case.  I premarked a copy of the victim's recorded statement and the related transcript as People's 8 and 8A. I lodged those 2 exhibits with the court. I did not see any writing or highlighting on People's 8A when I lodged the exhibit with the court.  I later printed out a new copy of the transcript and made photocopies of that newly-printed transcript for the jury.  I personally handed the jurors the photocopies of the transcript.  I did not see any writing or highlighting on any of the transcripts that I handed out.

(*Id.* at 107-108.)

When copies of the transcript were distributed to the jurors, the trial court gave them the following instructions:

> Transcripts themselves are not evidence.  The pieces of paper that you have is [*sic*] not evidence.  The evidence is the actual recording, whether it's in the form of a CD or a tape or whatever that might be, that is the actual evidence. [¶]  So if it ever becomes necessary from your perspective to revisit this, the actual source, the CD will be the evidence that you have.  So if there's ever a discrepancy between what may appear in the transcript in the form of a typed word or sentence and what's on the CD, it is the CD itself or the actual source that will govern what is said or not said.  But you will always have those transcripts to help you follow along and assist you as you listen.

(Ans., Reporter's Transcript, Dkt. No. 13-13 at 94-95.)

Habeas relief is not warranted because Cleveland's claim is based on speculation that the prosecutor made the highlighted marks, and submitted a copy thus marked as a trial exhibit.  As respondent points out:

> [P]etitioner's claim would require the prosecutor to have marked up the transcript with a green highlighter, make color copies of the marked-up transcript during trial,[6] prepared the marked-up copies for distribution *with the courtroom clerk* (*see* 2RT 131), and then distributed those marked copies to the jurors, clerk, and trial judge with the bold hope that none of those individuals would notice and point out the fact that the transcript had been marked upon.  Indeed, the fact that none of those individuals pointed out the fact of any markings on the transcript suggests those transcripts, as received from the prosecutor and courtroom clerk, bore no markings.

---

[6] [Footnote in original]:  "According to petitioner's appellate counsel, the trial court clerk's copy bears green highlighter marks.  Exh. E, Petition, exh. A at pp 3."

United States District Court
Northern District of California

1    (Ans., Dkt. No. 12-1 at 37.)  Cleveland has not submitted any evidence indicating that

2    anyone at the trial (juror, clerk, trial judge) received a marked copy, let alone that the

3    prosecutor made those markings.  Trial counsel never saw the copies given to the jurors

4    and the prosecutor flatly denies making the markings.[7]  Because there is no factual support

5    that the prosecutor marked the copy seen by jurors or that jurors saw a marked copy, there

6    is no showing the prosecutor committed any misconduct.

7         Also, Cleveland has not shown how the markings (if the jurors had seen them)

8    made any difference at trial or were related to the significant issue of identification.  The

9    markings are few in number, and, with one exception, are just markings:  dots,

10   checkmarks, brackets, and a line under the occasional word, etc.  (Ans., Interview

11   Transcript of Marlon, Dkt. No. 13-13 at 354-387.)  The exception is the handwritten

12   "Important" (which is preceded by a green asterisk) next to a question the police asked

13   Marlon.  (*Id.* at 360.)  But neither that question nor its answer have any apparent relation to

14   Cleveland's guilt:  "Okay, I just wanna pause for a second.  At that point, have you

15   communicated with anybody else about where you're at, what you're gonna do, or

16   anything or anything like that?"  (*Id.*)  Marlon's response was "No."  (*Id.*)

17        In addition, there has been no showing of prejudice or that the trial was unfair.  The

18   trial court instructed the jurors that the transcripts were not evidence, but rather a tool to

19   assist the jurors in examining the actual evidence:  the recording.  Jurors are presumed to

20   follow their instructions, and I must presume that the jurors paid attention to the recording

21   as evidence, not the transcript.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

22   Furthermore, the evidence inculpating Cleveland was strong, as detailed above.

23        Upon an independent review of the record, I conclude that the state court's rejection

24   of this claim was not objectively unreasonable and is therefore entitled to AEDPA

25   deference. The claim is DENIED.

26

27   ──────────────────
     [7] Respondent conjectures that the markings on the trial exhibit "presumably were made by
28   the trial judge as he followed along with audio tape of the interview; that was the purpose
     of the transcript, after all."  (Ans., Dkt. No. 12-1 at 38.)

**CONCLUSION**

The state court's adjudication of Cleveland's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Cleveland may seek a certificate of appealability from the Ninth Circuit.

Cleveland's motion to stay is DENIED. (Dkt. No. 19.) Because petitioner is not entitled to relief on his claim, a stay is unwarranted.

The Clerk shall terminate all pending motions, enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

**Dated:** January 28, 2021

WILLIAM H. ORRICK
United States District Judge